

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2014 OCT 31  PM 2: 40

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## 14-MC-0239

MISC. FILE NO. _____

### NOTICE OF FILING OF COMPLAINT AND RECEIVERSHIP ORDER FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA PURSUANT TO 28 U.S.C. § 754

**PLEASE TAKE NOTICE** that pursuant to an Order entered on October 21,

2014 (the "Receivership Order") in Civil Action No. 1:14-CV-03017 (the

"Receivership Action") pending in the United States District Court for the Northern District of Georgia, GGG Partners, LLC has been appointed as receiver (the "Receiver") over the assets of the above-referenced Defendants.  Pursuant to 28 U.S.C. § 754, the Receiver files this notice of the filing of the attached complaint (the "Complaint") and the entry of the Receivership Order in this District in order that Receiver be vested with complete jurisdiction and control of all property located in this District that is subject to the Receivership Order.

Copies of the Complaint and the Receivership Order are attached hereto as Exhibits A and B, respectively.  Any inquiries regarding the Receivership Action may be directed to counsel for the Receiver listed below.

This 30th day of October, 2014.

Respectfully submitted,

1500 Candler Building
127 Peachtree Street, N.E.
Atlanta, GA 30303
T: (404) 893-3880
F: (404) 893-3886
E: rwilliamson@swlawfirm.com
    hkepner@swlawfirm.com

SCROGGINS & WILLIAMSON, P.C.

J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

*Counsel for the Receiver GGG
Partners, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true and correct copy of the within and foregoing **Notice of Filing Complaint and Receivership Order from the United States District Court for the Northern District of Georgia Pursuant to 28 U.S.C. § 754** by causing same to be deposited in the United States mail with adequate postage affixed thereon and addressed to the following persons:

Michael L. Hall
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203

Graham Stieglitz
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203

Gary W. Marsh
Jeffrey A. Zachman
MCKENNA LONG & ALDERIDGE
LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308

This 30th day of October, 2014.

SCROGGINS & WILLIAMSON, P.C.

_____
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

1500 Candler Building
127 Peachtree Street, N.E.
Atlanta, GA 30303
T:  (404) 893-3880
F:  (404) 893-3886
E:  rwilliamson@swlawfirm.com
    hkepner@swlawfirm.com

*Counsel for the Receiver GGG Partners, LLC*

**EXHIBIT "A"**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, | ) ) ) ) | |
| **Plaintiff,** | ) ) ) | **CIVIL ACTION** |
| v. | ) ) ) | **NO. _____** |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## COMPLAINT FOR BREACH OF CONTRACT AND FOR APPOINTMENT OF A RECEIVER

## SUMMARY OF CASE

Mosaica ("MEI") operates charter schools in multiple states with more than

10,000 students actively enrolled in American classroom schools.  MEI is in

substantial default on its now matured approximately $20 million of indebtedness to its primary lender Tatonka. Tatonka holds a first lien on substantially all of MEI's operating assets. MEI is also in default on other financial obligations. Tatonka could foreclose, but foreclosure would adversely affect thousands of schoolchildren, teachers, others, and the going concern value of the business.

Tatonka has chosen to seek the appointment of a receiver in order to keep the schools operating without shutting down, even for a day. This is one of Tatonka's express contractual remedies. This permits MEI's most valuable assets, its teachers, to continue to work without interruption. Meanwhile, MEI's finances can be restructured and the schools can continue to operate throughout that period and thereafter.

## INTRODUCTION

**COMES NOW**, plaintiff Tatonka Capital Corporation ("Tatonka"), and for its complaint seeking the payment of contractual debt, recovery of collateral, and for the appointment of a receiver (this "Complaint") against defendants Mosaica Education, Inc. ("MEI"), and the wholly-owned subsidiaries of MEI as follows: Michigan Educational Facilities, LLC, a Delaware limited liability company, ASI Texas, LLC, a Delaware limited liability company, EFA Company, LLC, a Michigan limited liability company, Lorain-Leavitt Properties, LLC, a Georgia limited liability company, Warren-Elm Facilities, LLC, a Georgia limited liability

company, and Columbus-Morse Properties, LLC, a Georgia limited liability company (collectively, the "Subsidiaries," and along with MEI, the "Defendants"). As support for this Complaint, together with *Tatonka's Submission of Documentary Evidence* ("Evidentiary Submission"), filed contemporaneously herewith, Tatonka states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Tatonka is a Colorado corporation with its principal place of business in Denver, Colorado.

2.      MEI is a Delaware corporation with its principal place of business in Atlanta, Georgia, or in New York City, New York.

3.      Michigan Educational Facilities, LLC is a Delaware limited liability company whose sole member/owner is MEI.

4.      ASI Texas, LLC is a Delaware limited liability company whose sole member/owner is MEI.

5.      EFA Company, LLC is a Michigan limited liability company whose sole member/owner is MEI.

6.      Lorain-Leavitt Properties, LLC is a Georgia limited liability company whose sole member/owner is MEI.

7.      Warren-Elm Facilities, LLC is a Georgia limited liability company whose sole member/owner is MEI.

8.     Columbus-Morse Properties, LLC is a Georgia limited liability company whose sole member/owner is MEI.

9.     The amount in controversy, exclusive of interest and costs, between Tatonka and each of the Defendants exceeds $75,000.

10.     This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

11.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### I. MEI'S EDUCATION MODEL

12.     MEI was founded in 1997 as a response to the growing desire for alternatives to traditional public education.   After opening the first elementary school in September of 1997, MEI continued to grow its educational institutions and services.   In 2001, MEI acquired Advantage Schools, Inc., increasing its schools to sixteen.   This growth continued as the organization began the development of independent charter schools throughout the United States.   As a part of its business and mission, MEI works with local governmental entities, community groups, and nonprofit organizations to integrate its educational program within a diversity of localized needs.

13.  Today, MEI manages K-12 schools and provides education services both domestically and internationally.  At present, MEI manages over thirty preschool, elementary, middle, and high school programs in the United States. MEI's website states that, as of February 2014, it served approximately 25,000 students in these jurisdictions and through their online programs.  More than 10,000 of these students attend classroom schools in the United States.  The services offered by MEI include, but are not limited to:

- Whole school management services;
- Whole school operations;
- Consulting and training services for underperforming schools;
- Online courses and virtual schools; and
- Comprehensive curriculum design, support, development and licensing

14.  As an important part of its curriculum services, MEI developed its Paragon© curriculum.  MEI asserts that this curriculum provides a hands-on approach seeking to tailor the curriculum to students' varied intelligences and learning styles, is aligned to national and state education standards, and is research-based and classroom-tested with fifteen years of success.  Paragon© is web-based and utilizes the strengths of interactive whiteboard technology.  It also provides overviews and comprehensive support materials for teachers.  It helps connect students in various jurisdictions across the curriculum.

15.  MEI typically operates by either: (i) creating management contracts with new charter schools in academic emergency areas, or (ii) taking over the

management of failing schools.  In the case of failing schools, typically students are behind standard grade level.  Performance varies greatly, but MEI claims that it generally raises the education level of students about 1.5 years for every 1.0 years of instruction.

## II.   MEI'S BUSINESS OPERATIONS

16.   MEI has contracts to operate and manage charter schools (and is actively running these charter schools) in several states, including, but not limited to, Ohio, Michigan, Pennsylvania, and Arizona.  These schools are owned by corporations or other non-profit organizations qualified under Section 501(c)(3) of the Internal Revenue Code, and usually have their own board of directors.  These non-profit organizations contract with MEI to run the schools.

17.   MEI's business is operated out of offices located in Atlanta, Georgia.

18.   The leadership personnel for each school operated by MEI reports to MEI personnel in metropolitan Atlanta.

19.   The founders Gene and Dawn Eidelman, two of MEI's three principals who hold the majority interest of the common stock in MEI, reside and work in the Atlanta metropolitan area.  CEO, Mike Connelly, the third principal holds a minority interest and resides and works in New York City.  Mike Connelly, Dawn Eidelman, and John Murphy constitute the Board of MEI.

Murphy also resides in New York, but other than being a board member, he plays no active role in MEI.

20.    MEI and all of its American subsidiaries each formally assert that their headquarters are in New York. The majority of MEI's employees who are not affiliated with a particular school live and work in Georgia, while about seven employees live and work in New York. MEI currently operates no schools in New York or Georgia.

21.    Gene Eidelman, the President and interim Chief Financial Officer of MEI is based out of Georgia. In addition, the educational leadership of MEI operates from its Georgia offices.

22.    The Subsidiaries do not operate schools or any active business. Rather, they hold real estate that was obtained for the purpose of operating a school. These real estate holdings are the sites for the charter schools managed by MEI, although some of the real estate is presently vacant.

23.    MEI also operates multiple online schools in various states. Since their inception, the online schools have operated with fewer students than anticipated.

24.    The Paragon© curriculum is unique to MEI and distinguishes MEI from other non-traditional school choices. Paragon© tends to attract capital and operating contracts.

25.    MEI operates schools in other countries through separate legal entities. Tatonka has elected in this action not to sue MEI's subsidiaries organized in other countries due to cross-border concerns.

### III. MEI'S RECENT FINANCIAL DISTRESS

26.    MEI has long been in substantial financial and covenant default to Tatonka.  MEI has not made a regularly scheduled payment to Tatonka since July 2013.  As shown below, MEI's finances have recently worsened.

27.    Over the last few years MEI invested heavily in an online school. MEI's online school has relatively few students, far less than the amount anticipated.  The online school has operated at a net loss of approximately a million dollars a year for a multiple years.

28.    With regard to its real estate assets, MEI has vacant properties and unimproved land generating no income.  MEI has made few attempts to monetize these assets and has allowed listings for these real estate assets to expire.

29.    MEI opened and operated several schools in Abu Dhabi and Qatar for more than five years before shutting down the schools.  Yet for approximately a year after closing, MEI maintained staff at these sites, causing an extra $500,000 cash drain.

30.    MEI also opened schools in Arizona.  Due to a few years of declining enrollment, one of the schools could not make its rental and management fee

payments to MEI. As a result, MEI defaulted on its loan obligations to its lender and the lender eventually foreclosed on the property and evicted the school. Prior to foreclosure, MEI advanced additional funds to the school, resulting in a multi-million dollar receivable from the school which is uncollectable at this time. MEI also made the decision to lease new property for the school with a reduced enrollment base from the prior location, resulting in further financial losses.

31.     One of MEI's more recent business mistakes comes from MEI's decisions regarding a school in Muskegon Heights, Michigan. The first year MEI managed the school it maintained an enrollment of 1200 students. After that year, enrollment declined to 800 students, a decline of over thirty percent. At that time, MEI unwisely chose to advance additional funds to the school, even though the school's financial situation was such that MEI had not even been paid its management fee. This was a significant cash drain on MEI that exacerbated an already bad financial situation and caused a $2 million write off.

32.     MEI has made a series of bad business decisions. Its major problem is that it makes investments into failing operations, throwing good money at bad situations. In addition to Arizona and Muskegon Heights investments, MEI has repeatedly invested in a new curriculum development project and its online school despite the negative cash flow created by those enterprises. MEI is unwilling or

unable to make the necessary changes to operate as a profitable business. This continuous failure has immediate consequences.

33.    During MEI's fiscal year 2014, Tatonka waited while MEI was supposed to implement various cost saving and revenue growing projects. Despite this effort, MEI failed to successfully execute on these opportunities.

34.    In August 2014, Tatonka setoff approximately $300,000 of MEI's money to pay debts owing to Tatonka. This decision to setoff was made after numerous conversations between Tatonka and MEI.

35.    A few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries. MEI is generally not even appearing, let alone defending, these lawsuits.

36.    MEI's financial distress is becoming widely known to at least the school boards, school administrators, teachers, and creditors.

37.    MEI's constituencies need to be assured that the schools will be open for the near term and long term.

38.    MEI has in excess of $86 million in net operating losses over its years of operation.

## IV. MEI'S FINANCIAL OBLIGATIONS TO TATONKA

### A.     The Loans

39.     Tatonka has had a longstanding financial relationship with MEI and its subsidiaries.  Tatonka has financed MEI for more than ten years.  During this time, Tatonka, as MEI's senior secured lender, has obtained a senior perfected security interest in almost all of MEI's assets, including its Paragon© curriculum (collectively, the "Collateral"), as described in further detail below.  In connection with this longstanding financial relationship, from time to time, Tatonka made certain revolving and term loans to MEI and some of its subsidiaries (collectively, the "Loans"), as further described below.

### i.     The 2007 Loan

40.     On or about February 28, 2007, Tatonka made a loan to MEI in the stated principal amount of $10,000,000.00, as evidenced by that certain Amended and Restated Credit Agreement dated February 28, 2007 between Tatonka and MEI (as amended or modified from time to time, the "2007 Loan Agreement").  The 2007 Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed, from time to time, to make advances of the principal amount to MEI and certain of its wholly-owned subsidiaries for the purchase and ownership of real estate and the construction, renovation, leasing and operating of charter schools on such real estate, secured by mortgages or deeds of trust on the

real estate and by guaranties from MEI (collectively, the "2007 Loan"). *Evidentiary Submission*, Ex. 2.

41.   Pursuant to the terms of the 2007 Loan Agreement, on or about December 27, 2007, Tatonka advanced a loan to Michigan Educational Facilities, LLC ("MEF"), a wholly-owned subsidiary of MEI, in the original principal amount of $2,934,288.00 (the "MEF Loan"), as evidenced by: (i) that certain Loan Agreement dated December 27, 2007 between MEF and Tatonka (as amended or modified from time to time, the "MEF Loan Agreement"); and (ii) that certain Replacement Promissory Note dated December 27, 2007 from MEF to Tatonka (the "MEF Note").   The MEF Loan is secured by: (i) that certain Mortgage, Security Agreement, Financing Statement, and Assignment of Rents and Leases dated December 27, 2007 from MEF to Tatonka recorded with the Register of Deeds of Wayne County, Michigan, in Liber 47097, Pages 319-351 on March 31, 2008 (the "MEF Mortgage"), and (ii) that certain Guaranty Agreement dated December 27, 2007 from MEI to Tatonka (the "MEF Guaranty").   The MEF Mortgage, MEF Guaranty, MEF Note, MEF Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the MEF Loan, are referred to herein as the "MEF Loan Documents." *Evidentiary Submission*, Exs. 3-6.

42.     Pursuant to the terms of the 2007 Loan Agreement, on or about December 27, 2007, Tatonka advanced a loan to EFA Company, LLC ("EFA"), a wholly-owned subsidiary of MEI, in the original principal amount of $3,000,000.00 (the "EFA Loan"), as evidenced by: (i) that certain Loan Agreement dated December 27, 2007 between EFA and Tatonka (as amended or modified from time to time, the "EFA Loan Agreement") and; (ii) by that certain Promissory Note dated December 27, 2007 from EFA to Tatonka ("EFA Note"). The EFA Loan is secured by: (i) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases dated February 1, 2008 from EFA to Tatonka recorded with the Register of Deeds of Wayne County, Michigan in Liber, 47026, Page 1456-1488 on February 28, 2008, as amended by First Amendment to Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases dated April 13, 2011, recorded with said Register of Deeds in Liber 49157, Pages 437-540 on April 25, 2011 (as amended, the "EFA Mortgage"), and (ii) that certain Guaranty Agreement dated December 27, 2007 by MEI in favor of Tatonka ("EFA Guaranty").   The EFA Mortgage, EFA Guaranty, EFA Note, EFA Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the EFA Loan, are referred to herein as the "EFA Loan Documents." *Evidentiary Submission*, Exs. 7-10.

43.     Pursuant to the terms of the 2007 Loan Agreement, on or about July 24, 2007, Tatonka advanced a loan to Lorain-Levitt Properties, LLC ("L-LP"), a wholly-owned subsidiary of MEI, in the original principal amount of $411,500.00 (the "L-LP Loan"), as evidenced by: (i) that certain Loan Agreement dated July 24, 2007 from L-LP to Tatonka (as amended or modified from time to time, the "L-LP Loan Agreement"); and (ii) that certain Replacement Promissory Note dated July 24, 2007 from L-LP to Tatonka (the "L-LP Note").  The L-LP Loan is secured by:  (i) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated July 24, 2007 from L-LP to Tatonka recorded with the Recorder of Lorain County Ohio, as File No. 2007-0216075 on July 31, 2007, as assigned by that certain Assignment of Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents from Tatonka Funding, LLC, to Tatonka, dated May 1, 2012 and recorded with said recorded as File No. 2012-0414117 (as assigned, the "L-LP Mortgage"), and (ii) that certain Guaranty Agreement dated July 24, 2007 from MEI to Tatonka (the "L-LP Guaranty").    The L-LP Mortgage, the L-LP Guaranty, L-LP Note, L-LP Loan Agreement, together with any and all instruments evidencing and/or securing or relating to the L-LP Loan, are referred to herein as the "L-LP Loan Documents." *Evidentiary Submission*, Exs. 11-14.

44.   Also in connection with the 2007 Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated July 1, 2011 from MEI to Tatonka (as amended or modified from time to time, the "July 1, 2011 Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the 2007 Loan Agreement. *Evidentiary Submission*, Ex. 15.

45.   The 2007 Loan Agreement, MEF Loan Agreement, EFA Loan Agreement, LLP Loan Agreement, together with all documents evidencing or securing the 2007 Loan, MEF Loan, EFA Loan, LLP Loan, shall hereinafter be referred to as the "2007 Loan Documents").

ii.      The Revolver Loan

46.   On or about October 30, 2007, Tatonka made a loan to MEI in the stated principal amount of $10,000,000.00, as evidenced by that certain Revolver Loan and Security Agreement dated October 30, 2007 between Tatonka and MEI (as amended or modified from time to time, the "Revolver Loan Agreement"). The Revolver Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed to, from time to time, make advances of the principal amount to MEI, in accordance with the terms of that agreement (collectively, the "Revolver Loan"). *Evidentiary Submission*, Ex. 16.

47.   In accordance with the Revolver Loan Agreement, MEI executed and delivered to Tatonka that certain Revolver Promissory Note dated October 30,

2007 in the stated principal amount of $10,000,000.00 from MEI payable to Tatonka (as amended from time to time, the "Revolver Note"). *Evidentiary Submission*, Ex. 17.

48.   As additional security for the payment and performance of the obligations under the Revolver Agreement, MEI also executed and delivered to Tatonka: (i) that certain Collateral Assignment of Promissory Notes dated October 30, 2007 from MEI to Tatonka, (ii) that certain Collateral Assignment of Promissory Notes dated October 30, 2007 from ASI Texas, LLC, to Tatonka, and (iii) that certain Collateral Assignment of Security Interest dated July 2, 2013 and recorded on July 10, 2013 with the Clerk of Superior County of Fulton County, Georgia in Deed Book 52876, Page 292 (together, the "October 2007 Assignments"). *Evidentiary Submission*, Ex. 18.

49.   Also in connection with the Revolver Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated in 2011 from MEI to Tatonka (the "Revolver Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the Revolver Loan Agreement. *Evidentiary Submission*, Ex. 19.

50.   The Revolver Loan Agreement, together with all documents evidencing or securing the Revolver Loan shall hereinafter be referred to as the ("Revolver Loan Documents").

iii.    The Project Loan

51.    On or about April 13, 2011, Tatonka made a loan to MEI in the stated principal amount of $8,000,000.00, as evidenced by that certain 2011 Credit Agreement dated April 13, 2011 between MEI and Tatonka (as amended or modified from time to time, the "Project Loan Agreement").  The Project Loan Agreement evidences a line of credit available to MEI pursuant to which Tatonka agreed to, from time to time, make advances of the principal amount to MEI and certain of its wholly-owned subsidiaries for the purchase and ownership of real estate and the construction, renovation, leasing and operating of charter schools on such real estate, secured by mortgages or deeds of trust on the real estate and by guaranties from MEI (the "Project Loan"). *Evidentiary Submission*, Ex. 20.

52.    Pursuant to the terms of the Project Loan Agreement, on or about April 13, 2011, Tatonka advanced to Columbus-Morse Properties, LLC ("CMP"), a wholly owned subsidiary of MEI, a loan in the original principal amount of $4,434,261.72 (the "CMP Loan"), as evidenced by: (i) that certain Promissory Note dated April 13, 2011 from CMP to Tatonka (the "CMP Note"); and (ii) that certain Loan Agreement dated April 13, 2011 between CMP and Tatonka (as amended or modified from time to time, the "CMP Loan Agreement").  The CMP Loan is secured by: (i) that certain Guaranty Agreement dated April 13, 2011 from MEI to Tatonka ("CMP Guaranty"); (ii) that certain Mortgage and Security

Agreement dated April 13, 2011 from CMP and MEI to Tatonka recorded with the Recorder of Franklin County, Ohio as Instrument Number 201104280055471 on April 28, 2011. *Evidentiary Submission*, Exs. 21-24.

53.    Pursuant to the terms of the Project Loan Agreement, on or about May 24, 2011, Tatonka advanced to ASI Texas, LLC ("ASI"), a wholly owned subsidiary of MEI, a loan in the original principal amount of $1,000,000.00 (the "ASI Loan"), as evidenced by: (i) that certain Promissory Note dated May 24, 2011 from ASI to Tatonka (the "ASI Note"); and (ii) that certain Amended and Restated Loan Agreement dated May 24, 2011 from ASI to Tatonka. The ASI Loan is secured by: (i) that certain Guaranty Agreement dated May 24, 2011 from MEI to Tatonka ("ASI Guaranty"); and (ii) that certain Deed of Trust, Security Agreement, Financing Statement and Assignment of Leases and Rents dated March 1, 2009 from ASI to Tatonka, recorded with the Clerk of Midland County, Texas as Instrument Number 2009-7516 on April 20, 2009, as amended by that certain First Amendment Deed of Trust, Security Agreement, Financing Statement and Assignment of Leases and Rents dated May 31, 2009, recorded in said Clerk's office as Document Number 2009-16137 on July 31, 2009 (the "ASI Deed of Trust"). *Evidentiary Submission*, Exs. 25-28.

54.    Pursuant to the terms of the Project Loan Agreement, on or about May 24, 2011, Tatonka advanced to Warren-Elm Facilities, LLC ("Warren"), a wholly

owned subsidiary of MEI, a loan in the original principal amount of $2,565,738.28 (the "Warren Loan"), as evidenced by: (i) that certain Restated Promissory Note dated May 24, 2011 from Warren to Tatonka (the "Warren Note"); and (ii) that certain Amended and Restated Loan Agreement dated May 24, 2011 from Warren to Tatonka (as amended or modified from time to time, the "Warren Loan Agreement").   The Warren Loan is secured by: (i) that certain Guaranty Agreement dated May 24, 2011 from MEI to Tatonka ("Warren Guaranty"); and (ii) that certain Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated March 1, 2009 from Warren to Tatonka, recorded with the Recorder of Trumball County, Ohio as Instrument Number 200906150011676 on June 15, 2009, as amended by that certain First Amendment Mortgage, Security Agreement, Financing Statement and Assignment of Leases and Rents dated May 24, 2011 (the "Warren Mortgage"). *Evidentiary Submission*, Exs. 29-32.

55.   Also in connection with the Project Loan Agreement, MEI executed and delivered to Tatonka that certain Fee Agreement dated April 13, 2011 from MEI to Tatonka (as amended or modified from time to time, the "April 13, 2011 Fee Agreement"), which provided an inducement for Tatonka to enter into an amendment to the Project Loan Agreement.   *Evidentiary Submission*, Ex. 33.

56.    The Project Loan Agreement, the CMP Loan Agreement, the ASI Loan Agreement, the Warren Loan Agreement, together with all documents evidencing or securing the Project Loan, the CMP Loan, the ASI Loan, and the Warren Loan shall hereinafter be referred to as the "Project Loan Documents").

iv.    2012 Loan Agreement

57.    On or about August 14, 2012, Tatonka made a loan to MEI in the stated principal amount of $700,000.00 (the "2012 Loan"), as evidenced by that certain Loan Agreement dated August 14, 2012 between Tatonka and MEI (as amended or modified from time to time, the "2012 Loan Agreement") and by that certain Promissory Note dated August 14, 2012 from MEI to Tatonka. The 2012 Loan is secured by that certain Collateral Assignment of Promissory Notes dated August 14, 2012 from MEI to Tatonka ("2012 Collateral Assignment"), assigning $929,124.00 Promissory Note dated June 30, 2009 from Space, Technology and Arts Academy ("STAR Academy") payable to MEI and $300,000.00 Promissory Note dated July 1, 2009 from STAR Academy payable to MEI. The 2012 Loan Agreement, together with all documents evidencing or securing the 2012 Loan, shall hereinafter be referred to as the "2012 Loan Documents"). *Evidentiary Submission*, Exs. 34-36.

  v. Assignment of Notes and Accounts Receivable

 58. Due to ongoing defaults under the Loan Documents (as defined herein) and in exchange for Tatonka's promise to forbear on its right to foreclose, on or about April 11, 2014, MEI, along with certain of its wholly owned subsidiaries, assigned to Tatonka all of right, title, and interest in: (i) certain promissory notes payable to MEI, and (ii) certain accounts receivable of MEI (the "April 11 Transaction"). *Evidentiary Submission*, Exs. 37-46.

  vi. Guaranties

 59. From to time, MEI, certain of MEI's wholly-owned subsidiaries and the principals of MEI executed Guaranties to secure the various obligations under the Loan Documents (the "MEI Guaranties"). *Evidentiary Submission*, Exs. 47-49.

 **B.** **Stock Owned by Tatonka Affiliates**

 60. In 2007, in connection with the execution of the 2007 Loan Agreement and the making of the 2007 Loan by Tatonka to MEI, MEI issued to six purchasers affiliated with and/or employed by Tatonka (the "Tatonka Affiliates") a total of 30,000 shares of MEI common stock as well as common stock purchase warrants for the purchase of another 10,000 shares of MEI common stock. Also in 2007, MEI issued to these six affiliate purchasers warrants for the purchase of another 100,000 shares of common stock (the "2007

Stock Purchase Transaction"). The warrants provided an exercise price of $55.00 per share. The purchasers paid a $55.00 per share purchase price for the shares by delivering to MEI nominal cash payments ($0.01 per share) and non-recourse promissory notes ($54.99 per share). The promissory notes were secured by pledges of the purchased shares of common stock. The sole recourse and remedy for an event of default under the notes was for MEI to take possession of the pledged purchase shares. The Tatonka Affiliates have no personal liability with respect to the notes. *Evidentiary Submission,* Exs. 50-58.

61.   On July 14, 2010, the Tatonka Affiliates and MEI entered into that certain Warrant Repurchase Agreement (the "Warrant Repurchase Agreement"), pursuant to which the Tatonka Affiliates agreed to sell the 10,000 common stock purchase warrants back to MEI at a price of $10.00 per warrant, for an aggregate price of $100,000.00. Thus, Tatonka Affiliates presently own the 30,000 shares of common stock and warrants for the purchase of 100,000 shares of common stock. The shares of common stock are non-voting and have no value. *Evidentiary Submission,* Ex. 59.

C.   **UCC Filings**

62.   Appropriate financing statements covering the personal property collateral are also filed with the various filing offices (the "UCC Financing Statements"). *Evidentiary Submission,* Exs. 60-82.

63.    The UCC Financing Statements, 2012 Loan Documents, Project Loan Documents, 2007 Loan Documents, Revolver Loan Documents, together with all other documents and instruments evidencing and/or securing or relating to the Loans, are referred to herein as the "Loan Documents".

**D.    Existing Defaults**

64.    Tatonka and MEI executed an instrument entitled Agreement and Acknowledgement dated as of September 23, 2013 (the "2013 Forbearance Agreement"), whereby MEI acknowledged that it was then in default with respect to the Loan Documents and Tatonka agreed to forbear temporarily from exercising its rights and remedies under the Loan Documents, with respect to certain specified defaults MEI during a time period that would end no later than December 5, 2013 (the "Forbearance Termination Date").    This Forbearance Agreement was the last Forbearance Agreement between the parties.    The parties continued to negotiate other agreements, but these negotiations were unsuccessful. *Evidentiary Submission*, Ex. 83.

65.    The maturity date for each of the Loan Documents was on or prior to July 1, 2014 (the "Loan Maturity Date"). *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

66.    Both the Forbearance Termination Date and the Loan Maturity Date have passed and MEI remains in continuing and substantial default in several

regards with respect to the Loan Documents. First, MEI failed to pay the amounts owing under the Loan Documents when due. Second, MEI failed to comply with certain reporting requirements under Loan Documents. Third, MEI failed to allow Tatonka to examine their books and records, as is required under various provisions of the Loan Documents. Fourth, MEI failed to honor certain financial covenants as required under the Loan Documents. All of these failures constitute events of default, as defined in the Loan Documents (the "Defaults").

67. Specifically, in addition to payment default, the Defaults under the Revolver Loan Agreement include, but are not limited to, the following covenant defaults:

(i) cross default with other obligations owed to Tatonka under Section 9.1(d);

(ii) judgment in excess of $100,000.00 under Section 9.1(h);

(iii) the failure to deliver audited financial statements within 120 days of year end under Section 5.6(d);

(iv) the failure to satisfy net income covenant under Section 7.1.1; and

(v) failure to satisfy EBITDA to Debt Service covenant under Section 7.1.3.

*Evidentiary Submission*, Ex. 16.

68.     In addition to payment default, the Defaults under the 2007 Loan Agreement include, but are not limited to, the following covenant defaults:

(i)     judgment in excess of $100,000.00 under Section 7.1(j);

(ii)    cross default with other obligations owed to Tatonka under Section 7.1(k);

(iii)   failure to deliver audited financial statements within 180 days of the year's end under Section 6.8;

(iv)    failure to satisfy net income covenant set forth in Section 6.13(a), as required in Section 7.1(h).

*Evidentiary Submission*, Ex. 2.

69.     In addition to payment default, the Defaults under the Project Loan Agreement include, but are not limited to, the following covenant defaults:

(i)     failure to satisfy net income covenant set forth in Section 7.17(a), as required in Section 6.1(h);

(ii)    failure to satisfy EBITDA to Debt Service covenant under Section 6.1(h);

(iii)   judgment in excess of $100,000.00 under Section 6.1(j);

(iv)    cross default with other obligations owed to Tatonka under Section 6.1(l); and

(v)  failure to deliver audited financial statements within 180 days of the

year's end under Section 5.8(h).

*Evidentiary Submission*, Ex. 20.

70.  In addition to payment default, the Defaults under the 2012 Loan

Agreement include, but are not limited to, the following covenant default: (i) cross

default with other obligations owed to Tatonka under Section 6.1(h). *Evidentiary*

*Submission*, Ex. 34.

71.  The Defaults are continuing and have not been cured by MEI.

72.  As stated above, the Loans are cross defaulted.  Accordingly, each of

the above-referenced Defaults constitutes an event of default under the other Loan

Documents.

73.  The principal amount outstanding pursuant to the Loan Documents as

of August 31, 2014, exclusive of expenses of collection, attorneys' fees, late fees,

and the costs of this action, is $19,061,475.44.  Interest accrues daily at the default

rate provided in the Loan Documents.  Attorneys' fees and other costs of

collection also continue to accrue.  The principal amounts due, the unpaid interest,

attorneys' fees and costs of collection are hereinafter collectively referred to as the

"Outstanding Indebtedness."

## V. <u>TATONKA'S REMEDIES UNDER THE LOAN DOCUMENTS</u>

74.    Tatonka and its attorneys have had numerous conversations and communications with MEI and its attorneys in an attempt to resolve their differences.  MEI made it clear during these discussions that, despite the maturity of the various loans and Tatonka's requests for payment, they are presently unwilling to pay the Outstanding Indebtedness.  Also, during those discussions, the parties seriously discussed the appointment of a chief restructuring officer with full authority ("<u>CRO</u>").  Those discussions have not resulted in an agreement.

75.    The Defaults entitle Tatonka to exercise other rights and remedies under the Loan Documents, including the right to the appointment of a receiver.

76.    Under the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, MEI expressly and unequivocally agreed to the appointment of a receiver upon default, without prior notice.  Each of these agreements contain language authorizing the appointment of a receiver.  For example, Section 6.2 of the Project Loan Agreement provides that:

> Tatonka at its election may (but shall not be obligated to), without notice, do any one or more of the following:
>
> …
>
> (d)    exercise any and all rights and remedies afforded by this Agreement or any Facility Loan Documents, or under law, equity or otherwise, including obtaining appointment of a receiver.

*Evidentiary Submission*, Ex. 20.   Substantially similar language is used in the Revolver Loan Agreement, 2007 Loan Agreement, Project Loan Agreement, and 2012 Loan Agreement, each of which support the appointment of a receiver in this case. *Evidentiary Submission*, Exs. 2, 16, 20, and 34.

77.   As stated above, MEI is in substantial and continuing payment and covenant default to its senior secured lender Tatonka for the Outstanding Indebtedness.

## VI. <u>THE NEED FOR A RECEIVER</u>

78.   Tatonka has the right under the Loan Documents and applicable law to take possession of the Collateral (all assets of MEI) and effectively cease MEI's operations.   However, Tatonka prefers not to take this self-help action because it would:  (i) negatively impact the schoolchildren served by MEI during the pendency of the school year; and (ii) it would eliminate the going concern value of MEI, which would displace many teachers and other employees in addition to the students.

79.   Moreover, MEI's operations would likely have already been closed and its cash flow extinguished, but for Tatonka's repeated cooperation as MEI's senior secured lender.

80.   Tatonka wants the schools to continue to provide quality education to the students, while operating under a stable, fiscally responsible business model

that will allow the debt to Tatonka to be repaid.  At present, MEI's financial condition is unstable and untenable.  MEI has not recently provided Tatonka information from which Tatonka could determine an accurate financial picture with certainty, but MEI is clearly not paying many of its debts as they come due.

81.    It is apparent that the Collateral (which is essentially all of the assets of MEI) has been mismanaged, resulting in injury to, and waste of, the Collateral. In order for the Collateral to remain viable and sustain its value and to prevent potential harm to the schoolchildren, parents, teachers, and employees, a receiver is necessary to manage the schools which comprise most of the Collateral. Additionally, a receiver is needed to market the Collateral for a potential sale or sales to maximize the value of the Collateral as a going concern.  Without a receiver to oversee the Collateral, MEI's financial inability to fulfill its responsibilities will continue to negatively impact the viability of the schools and the value of the Collateral to the detriment of Tatonka and others.  The full extent of the problems will likely not be discovered until the receiver is granted full access to the Collateral.

82.    Without a receiver to manage the Collateral, Tatonka will continue to suffer substantial damages as the Collateral will decline in value.

83. The Collateral has earnings potential, but a receiver is necessary to stop the further deterioration of the value of the Collateral and to turn around MEI's financial condition.

84. The highest and best value of the Collateral appears to be as a going concern.

85. MEI was, is, and remains unable to cure the substantial and continuing Defaults to Tatonka and others.

86. A few other creditors either have or are in the process of obtaining substantial judgments by default against MEI and some of its Subsidiaries. MEI is generally not even appearing, let alone defending, these lawsuits. *Evidentiary Submission*, Ex. 84-86.

87. Accordingly, it is imperative that the receiver have authority and control of all of the aspects of the Collateral in order to fully preserve the going concern value of the schools and the Collateral, and Tatonka's rights under the Loan Documents, all with due regard to the rights of creditors, students, parents, teachers, and the school boards.

## COUNT ONE - BREACH OF CONTRACT

88. Tatonka incorporates and realleges the preceding paragraphs as if fully set forth herein.

89.   The Defendants are in default on their obligations to Tatonka to pay in full all amounts due and owing under the Loan Documents, including interest, attorneys' fees and costs, and all other charges thereunder.

90.   The Defendants have further failed to comply with certain financial covenants as required under the terms of the Loan Documents.

91.   The Outstanding Indebtedness remains due and owing.

**WHEREFORE,** Tatonka demands judgment against the Defendants for the Outstanding Indebtedness and costs, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

## COUNT TWO: APPOINTMENT OF RECEIVER IN EQUITY

92.   Tatonka incorporates and realleges all preceding paragraphs as if fully set forth herein.

93.   In addition to Tatonka's express contractual right to the appointment of a receiver at law, there are additional equitable considerations which support the appointment of a receiver in equity to manage and operate the Collateral.  In light of the Defendants' ongoing payment default, it is clear that the Defendants do not have sufficient funds to pay the amounts due and owing under the Notes. Accordingly, if the Collateral is not preserved, Tatonka and all other creditors of the Defendants will be left with no adequate legal remedy to redress the harm arising from the Defendants' breach of the Loan Documents.  The potential harm

to Tatonka, as well as the schools, students and MEI's other creditors, outweighs any conceivable harm to the Defendants.

94.    In addition, MEI's inability to pay its debts as they come due at some point will harm quality of education at the charter schools.  The Court needs to supervise the charter schools through the appointment of a receiver in equity to ensure that education standards continue unabated and perhaps even advanced through the appointment of a receiver.

95.    Tatonka offers to do equity.

96.    In the event Tatonka is not entitled to the appointment of a receiver as a legal remedy, then Tatonka would have no adequate remedy at law.

**WHEREFORE**, Tatonka demands judgment against the Defendants for the appointment of a receiver in equity, under terms substantially similar to those in the proposed order attached to the Motion for Receiver filed contemporaneously herewith, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

## COUNT THREE: APPOINTMENT OF A RECEIVER AT LAW

97.    Tatonka incorporates and realleges all preceding paragraphs as if fully set forth herein.

98.   In addition to Tatonka's right to have a receiver appointed as a matter of equity, Tatonka has the right to the appointment of a receiver at law through its contractual rights. *Evidentiary Submission*, Ex. 2, 16, 20, and 34.

99.   The Defendants are in default on its obligations under the Loan Documents and multiple Events of Default (as defined in the Loan Documents) exists. Thus, Tatonka is contractually entitled to the immediate appointment of a receiver.

**WHEREFORE**, Tatonka demands judgment against the Defendants for the appointment of a receiver at law, under terms substantially similar to those in the proposed order attached to the Motion for Receiver filed contemporaneously herewith, as well as such other, further, and different relief to which Tatonka may be entitled and is just and proper in this action.

s/Graham H. Stieglitz
Graham H. Stieglitz
Georgia  Bar No. 682047

Attorney for Plaintiff
TATONKA CAPITAL
CORPORATION

OF COUNSEL:

BURR & FORMAN LLP
171 Seventeenth Street, N.W., Suite 1100
Atlanta, Georgia  30363
(404) 815-3000
Email:  gstiegli@burr.com

**DEFENDANTS' ADDRESSES:**

Mosaica Education, Inc.
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Michigan Educational Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

ASI Texas, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

EFA Company, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Lorain-Leavitt Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Warren-Elm Facilities, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092

Columbus-Morse Properties, LLC
c/o Corporation Service Company
40 Technology Parkway South
Suite 300
Norcross, GA 30092


*With a courtesy copy via email to:*

William F. Gray, Jr.
Allison Bauer
Counsel for MEI
Torys, LLP
1114 Avenue of the Americas
23rd Floor
New York, NY 10036-7703
(212) 880-6336
Email: wgray@torys.com
        abauer@torys.com

JS44 (Rev. 1/13 NDGA)   Case 1:14-cv-03017-TCB   Document 1-1   Filed 09/19/14   Page 1 of 2

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

Tatonka Capital Corporation, a Colorado corporation

## DEFENDANT(S)

Mosaica Education, Inc., Michigan Education Facilities, LLC, ASI Texas, LLc, EFA Company, LLC, Lorain-Leavitt Properties, LLC, Warren-Elm Facilities, LLC and Columbus-Morse Properties, LLC

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Denver, Colorado
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Gwinnett County, Georgia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

Graham H. Stieglitz
Burr & Forman LLP
171 Seventeenth Street SW
Suite 1100
Atlanta, GA  30363 (404) 815-3000 gstiegli@burr.com

**ATTORNEYS** (IF KNOWN)

William F. Gray, Jr.
Torys LLP
1114 Avenue of the Americas
23rd Floor
New York, NY  10036-7703

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☐ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☒ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | ☐ 1 | ☐ 1 | CITIZEN OF THIS STATE | ☐ 4 | ☒ 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | ☐ 2 | ☐ 2 | CITIZEN OF ANOTHER STATE | ☒ 5 | ☐ 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | ☐ 3 | ☐ 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐ 6 | ☐ 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

☒ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

A breach of contract action also seek appointment of an active receiver to run 30 plus schools in multiple states.  Diversity 28 U.S.C. 1334

**(IF COMPLEX, CHECK REASON BELOW)**

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☒ 3. Factual issues are exceptionally complex (running 30 plus schools)

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 10. Existence of highly technical issues and proof.

### CONTINUED ON REVERSE

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT $ _____   APPLYING IFP _____   MAG. JUDGE (IFP) _____

JUDGE _____   MAG. JUDGE _____   NATURE OF SUIT _____   CAUSE OF ACTION _____
(Referral)

# VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- ☐ 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- ☐ 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- ☐ 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- ☐ 110 INSURANCE
- ☐ 120 MARINE
- ☐ 130 MILLER ACT
- ☐ 140 NEGOTIABLE INSTRUMENT
- ☐ 151 MEDICARE ACT
- ☐ 160 STOCKHOLDERS' SUITS
- ☒ 190 OTHER CONTRACT
- ☐ 195 CONTRACT PRODUCT LIABILITY
- ☐ 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 210 LAND CONDEMNATION
- ☐ 220 FORECLOSURE
- ☐ 230 RENT LEASE & EJECTMENT
- ☐ 240 TORTS TO LAND
- ☐ 245 TORT PRODUCT LIABILITY
- ☐ 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- ☐ 310 AIRPLANE
- ☐ 315 AIRPLANE PRODUCT LIABILITY
- ☐ 320 ASSAULT, LIBEL & SLANDER
- ☐ 330 FEDERAL EMPLOYERS' LIABILITY
- ☐ 340 MARINE
- ☐ 345 MARINE PRODUCT LIABILITY
- ☐ 350 MOTOR VEHICLE
- ☐ 355 MOTOR VEHICLE PRODUCT LIABILITY
- ☐ 360 OTHER PERSONAL INJURY
- ☐ 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- ☐ 365 PERSONAL INJURY - PRODUCT LIABILITY
- ☐ 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- ☐ 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 370 OTHER FRAUD
- ☐ 371 TRUTH IN LENDING
- ☐ 380 OTHER PERSONAL PROPERTY DAMAGE
- ☐ 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- ☐ 422 APPEAL 28 USC 158
- ☐ 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 441 VOTING
- ☐ 442 EMPLOYMENT
- ☐ 443 HOUSING/ ACCOMMODATIONS
- ☐ 444 WELFARE
- ☐ 440 OTHER CIVIL RIGHTS
- ☐ 445 AMERICANS with DISABILITIES - Employment
- ☐ 446 AMERICANS with DISABILITIES - Other
- ☐ 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- ☐ 462 NATURALIZATION APPLICATION
- ☐ 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- ☐ 463 HABEAS CORPUS- Alien Detainee
- ☐ 510 MOTIONS TO VACATE SENTENCE
- ☐ 530 HABEAS CORPUS
- ☐ 535 HABEAS CORPUS DEATH PENALTY
- ☐ 540 MANDAMUS & OTHER
- ☐ 550 CIVIL RIGHTS - Filed Pro se
- ☐ 555 PRISON CONDITION(S) - Filed Pro se
- ☐ 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- ☐ 550 CIVIL RIGHTS - Filed by Counsel
- ☐ 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- ☐ 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- ☐ 710 FAIR LABOR STANDARDS ACT
- ☐ 720 LABOR/MGMT. RELATIONS
- ☐ 740 RAILWAY LABOR ACT
- ☐ 751 FAMILY and MEDICAL LEAVE ACT
- ☐ 790 OTHER LABOR LITIGATION
- ☐ 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 820 COPYRIGHTS
- ☐ 840 TRADEMARK

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- ☐ 830 PATENT

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- ☐ 861 HIA (1395ff)
- ☐ 862 BLACK LUNG (923)
- ☐ 863 DIWC (405(g))
- ☐ 863 DIWW (405(g))
- ☐ 864 SSID TITLE XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- ☐ 870 TAXES (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- ☐ 375 FALSE CLAIMS ACT
- ☐ 400 STATE REAPPORTIONMENT
- ☐ 430 BANKS AND BANKING
- ☐ 450 COMMERCE/ICC RATES/ETC.
- ☐ 460 DEPORTATION
- ☐ 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- ☐ 480 CONSUMER CREDIT
- ☐ 490 CABLE/SATELLITE TV
- ☐ 891 AGRICULTURAL ACTS
- ☐ 893 ENVIRONMENTAL MATTERS
- ☐ 895 FREEDOM OF INFORMATION ACT
- ☐ 950 CONSTITUTIONALITY OF STATE STATUTES
- ☐ 890 OTHER STATUTORY ACTIONS
- ☐ 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- ☐ 410 ANTITRUST
- ☐ 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- ☐ 896 ARBITRATION
  (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3.**

---

# VII. REQUESTED IN COMPLAINT:

☐ CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23   DEMAND $ 20,000,000.00+

JURY DEMAND ☐ YES ☒ NO (CHECK YES **ONLY** IF DEMANDED IN COMPLAINT)

---

# VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE _____   DOCKET NO. _____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- ☐ 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- ☐ 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- ☐ 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):
- ☐ 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case ☐ IS ☐ IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

---

s/Graham H. Stieglitz, Ga. Bar #682047                    September 19, 2014

SIGNATURE OF ATTORNEY OF RECORD                           DATE

**EXHIBIT "B"**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation,<br><br>     Plaintiff,<br><br>v.<br><br>MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.<br>)  1:14-CV-03017-TCB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER APPOINTING RECEIVER

This matter came to be heard upon the *Motion for Appointment of Receiver* (the "Motion"), filed by plaintiff Tatonka Capital Corporation ("Tatonka" or "Plaintiff"). The Motion was filed contemporaneously with Tatonka's *Complaint for Breach of Contract and for Appointment of a Receiver* (the "Complaint"), commencing the instant action. The Complaint and Motion are filed against

defendants Mosaica Education, Inc. ("MEI") and certain of its wholly owned subsidiaries ("Subsidiaries"). Collectively, MEI and the Subsidiaries are referred to as the "Companies" or "Defendants".

The Court, after notice and an evidentiary hearing, having considered the pertinent pleadings, evidence, and argument of counsel, finds that the appointment of a receiver is appropriate and the Motion is due to be granted as set forth herein:

IT IS HEREBY **ORDERED, ADJUDGED**, and **DECREED** that the Motion is **GRANTED**, and that:

The Court finds that the appointment of a receiver for the assets and business operations of all of the Companies is proper and for good cause shown, both as a legal remedy based on contract and an equitable remedy based on the facts shown. The receiver's specific duties, rights, and obligations are set forth below. **The receiver's paramount duties are to provide appropriate and quality educational services at the schools operated by the Companies and to preserve, protect, and enhance the value of the Companies. Therefore, the receiver shall do its best to retain the vast majority of the present employees so as to maintain confidence and continuity. All other duties are subordinate to these primary duties.**

1.     To the extent the Receiver is obligated to deliver notices, reports, budgets, requests, and other information to Tatonka by the terms of this Order, the Receiver shall also contemporaneously deliver such papers to Defendants' counsel. Defendants' shareholders are granted standing on behalf of the Companies solely for the purpose of asserting and prosecuting defenses and claims against Tatonka. The deadline to respond to Tatonka's complaint shall be extended to February 26, 2015.

2.     GGG Partners, LLC, by and through its Managing Partner Katie S. Goodman, is hereby appointed receiver ("Receiver") of all of the Companies' assets and operations, including all real property, personal property, mixed property, and all stock and ownership interests held by MEI in its various subsidiaries, along with associated voting rights (the "Property"). Receiver is not an attorney for or related to any party to this action.

3.     The Property includes, without limitation, all of the Companies' assets, including management of charter schools, as well as all books and records related to the assets and business, accounts receivable reports, reports, revenues and proceeds of all assets, surety and performance bonds, letters of credit, security deposits, tax deposits, operations, performance deposits, escrow deposits, deposit accounts, keys, access codes and cards, books, records, accounts, bank accounts,

checkbooks, ledgers, accounts payable and accounts receivable records, leases,

reports, insurance policies and certificates, executory contracts, leasehold interests,

plans, specifications, drawings, surveys, technical manuals for all systems, together

with operating procedures, passwords, security codes, warranties, records required

to be kept under applicable safety, health care, and environmental laws, licenses,

permits, rights related to any state, federal, and local education agencies and

authorities, all tax benefits and rights, proffers, entitlements, trademarks, service

marks, trade names, intellectual property rights (including but not limited to the

Paragon© curriculum), claims, causes of action, choses in action and in general all

other information, data, instruments, documents, rights, properties or assets of any

kind or character whatsoever (whether tangible or intangible and whether real,

personal or mixed) forming a part of or related to the ownership, development, use,

operation and/or management of any and all of the Companies' assets, including

any and all assets that Receiver needs to perform Receiver's duties.

4.     Subject to control of this Court and the laws regarding receivership,

Receiver is authorized, pursuant to this Order, to do any and all acts necessary for

the proper and lawful conduct of the receivership.  Specifically, the following

orders are entered:

4

a. **Receiver's Exclusive and Complete Control over the Property.** Receiver is authorized to take and have complete and exclusive control and possession of the Property. Receiver is vested with all of the Property including the books, records, files, data, and information of the Companies;

b. **Bank Accounts**. Without any further action from the boards of the Companies, this Order authorizes Receiver to take control of existing bank accounts and to open any new bank accounts, and further authorizes Receiver to add and remove any existing signatories of any bank accounts. Receiver shall also be entitled to copies of any historical bank records of the Companies.

c. **Companies' Actions**. Until further order of the Court, any and all of the Companies and any persons acting under their direction or in concert with them are: (1) directed to deliver the Property to Receiver or as otherwise directed by Receiver; (2) enjoined from disturbing the Receiver's use and possession of the Property or other property that is the subject of this Order in any way; (3) prohibited and restrained from disposing of, dissipating, mishandling, or misappropriating any of the Property or other property that is the subject of this Order; (4) prohibited from taking any actions that would, directly or indirectly, have an adverse impact on the value of the

5

Property;   (5) prohibited   and   restrained   from   canceling,   reducing   or modifying any and all insurance coverage in existence with respect to the Property; and (6) prohibited and restrained from collecting any sums due to the Companies;

d. **Receiver's Right to Prevent Waste of, and to Preserve and/or Enhance the Property**.  Effective immediately, Receiver is directed to take any and all actions Receiver deems commercially reasonable and appropriate to keep operating the schools, provide services to the schools, to prevent waste to the Property, to preserve, secure, manage, maintain, safeguard, and enhance the Property and all other forms of property to which Receiver is entitled to take possession and control under this Order, and may, where appropriate in the exercise  of  its  business  judgment,  take  actions  to  enhance  education services,  and  the  value  of  the  Property.    Receiver  shall  take  reasonable actions to ensure that it complies with all laws applicable to the possession, use, occupancy, management, operation, and maintenance of the Property as provided under any and all laws and regulations;

e. **Budget**.  Beginning in December 2014, on or before the fifteenth (15th) business day in the month, and on or before the same day of every month thereafter until the receivership created by this Order is terminated, Receiver

shall furnish to Defendants and Tatonka a detailed, projected, monthly operating budget for the fiscal year for Receiver and the Property (as may be amended from time to time, the "Budget").  Tatonka and Defendants shall advise Receiver in writing within ten (10) business days after receipt of the Budget, or any amendment thereof, whether Tatonka or Defendants disapproves of the Budget, or any amendment thereof.   If Receiver, Defendants, and Tatonka are unable to resolve any dispute concerning the Budget, any party may petition the Court for a hearing to resolve such dispute;

f.  **Receiver's Right to Manage, Maintain, and Operate the Property.**  Receiver is authorized to manage and operate the Companies, including appointing the Receiver as the sole director, officer, member, board member, and manager, as applicable, of each of the Companies and all of their wholly owned direct or indirect subsidiaries.  Receiver is further authorized accept new students into the various operated schools, and to employ and pay such teachers, education professionals and workers, contractors, brokers, accountants, attorneys, and other persons and professionals as Receiver may in its sound business judgment deem necessary or appropriate in the management, conduct, control, or custody of the affairs of Companies and

the Property.   Receiver is further authorized to make payments and disbursements in the ordinary course of business and to make such payments and disbursements as may be necessary and proper for the preservation, maintenance, security, and enhancement of the Property.  Receiver may, but shall not be required to, perform under any contract or lease entered into prior to the date on which it assumes possession of the Property. Prior to taking any action previously authorized in this subparagraph, Receiver shall obtain any such approvals and/or consents that Companies would be required to obtain under applicable laws and regulations prior to taking any such action;

g. **Receiver Authorized to Market and Sell the Property**.   Receiver is authorized to market and sell unneeded pieces of the Property (as determined by the Receiver in its sole discretion) where the value of the individual asset is less than $25,000.  The sale of any material assets needed for operations may be approved only on the prior permission of the Court, after notice and right to be heard to the applicable school authority, Defendants and to Tatonka, and any other creditor or party in interest requesting notice in writing and served on the Receiver. The Court will look with disfavor on any proposed sale of any operating school that would result in the closing of

the school, particularly during the school year. Nonetheless, if such operation is creating financial instability, then the Court might permit such closure. Subject to such notice and approval, Receiver is authorized to sell all or a portion of the Property and other collateral, and execute on Defendants' behalf any necessary documents in connection with such sale and/or assumption. All liens, claims, interests, and encumbrances on any Property sold shall attach to any and all proceeds of such sale in the priority they now attach to the Property;

h. **Receiver's Right to Collect Amounts Due**. Receiver is authorized to receive and collect any and all sums due or owing to Companies in any manner related to the Property, whether the same are now due or shall hereafter become due and owing, to deposit such sums into an account established and maintained by Receiver, and to expend such sums on the operation and management of the Property in the ordinary course of its business. All persons in possession of the Property or any portion thereof are hereby directed to attorn to Receiver, and until further order of this Court are hereby: (i) directed to pay over to Receiver or its duly designated agent all rents, revenues, proceeds, or other sums payable with respect to the Property which are now due and unpaid or hereafter become due, and (ii)

enjoined and restrained from paying to Companies or their agents, officers, directors, employees, or attorneys any such rents, revenues, proceeds, or other sums;

i. **Disputes and Legal Actions Related to the Property and the Companies**. Subject to the provisions of Paragraph 1, Receiver is authorized to litigate, investigate, negotiate, and compromise for the Companies any and all disputes related to the Property or to the Companies. The Receiver can do so in its own name or in the name of the Companies. However, the Companies' shareholders may on their own contest any and all aspects of this proceeding in this Court;

j. **Insurance**. Receiver is authorized to maintain appropriate property insurance for the Property and Companies, public liability insurance, worker's compensation insurance, fire and extended coverage insurance, malpractice, health care, burglary and theft insurance, and other types of insurance normally obtained in connection with the operation and management of the Property and Companies, and is authorized to continue any current policies in place and to purchase further insurance as Receiver deems appropriate;

k. **Payment of Taxes; Preparation and Filing of Tax Returns for the Property**. Receiver is authorized to (i) pay all current and past due taxes, and any other taxes and any other governmental assessments against the Property, and (ii) prepare and file tax returns with respect to the Property, and other property subject hereto, as may be required by law. Receiver is authorized to negotiate with the Internal Revenue Service and other taxing authorities concerning any past due taxes that the Companies may owe and, in connection therewith, Receiver may execute a power of attorney on behalf of the Companies authorizing Receiver to conduct such negotiations. However, other than as set forth in a budget, any payment of past due employment taxes may not be made without express Court approval.

l. **Receiver's Right to Borrow Money.** In the event Receiver determines in its sole business judgment that Companies need more cash in order to adequately maintain the operations of the Property, Receiver is hereby authorized to borrow such funds and expenses as may be necessary to pay such costs and expenses on ordinary business terms as Receiver may negotiate and agree. However, such loan can prime the lien position of any Tatonka only upon either its consent or upon Court approval after due notice, a hearing, and a Court determination that such loan is in the best

interest of the receivership estate with due regard for the rights of all, particularly any secured creditor being primed (the "Receivership Loan"). The Receivership Loan shall bear interest at a reasonable rate, with such lien primed only by the unpaid fees and expenses of Receiver, subject to the rights of secured creditors as provided above. However, no personal recourse shall be had against Receiver with respect to the Receivership Loan, and any lender to the Receiver shall look solely to the Property and Companies' assets to satisfy any Receivership Loan;

m. **Payment of Utilities; Maintenance of the Property.** Receiver is authorized to: (1) negotiate and enter into new agreements, and contracts in the ordinary course of the business of the Property; (2) modify existing agreements and contracts in the ordinary course of the business of the Property; (3) pay all utilities, expenses, and other obligations secured by the Property or which may give rise to liens on the Property, and all other outstanding obligations to suppliers and service providers to the Companies for goods and services provided in the ordinary course of business as set forth in subsection (p) herein; and (4) make repairs necessary to the maintenance of the Property in the ordinary course of business in order to preserve the Property;

n. **Application of Income from the Property.** Receiver shall apply income from the Property as set forth elsewhere herein and, subject to the lien rights of secured creditors, as follows to the extent cash is available: (1) Receiver's approved fees and expenses; (2) the current operating expenses of the receivership in the ordinary course of the business and receiver's professionals; (3) payment of budgeted amounts for past due federal employment taxes as agreed upon in a tax payment plan by and between the Receiver, solely in its capacity as Receiver for the Property, on the one hand, and the Internal Revenue Service, on the other hand (the "Tax Plan"); (4) to a reserve account of $500,000 to cover upcoming expenses; (5) to the extent funds remain after payment of the foregoing items, a weekly amount, as stipulated in the budget may be paid to Tatonka, plus Tatonka's reasonable attorneys' fees (subject to the provisions of paragraph 6(d) below). Unless and until a Tax Plan is effectuated, the Receiver shall not make any payments on account of subparts (4) or (5) above. If and when the Tax Plan is effectuated, the Receiver shall apply income from the Property as set forth in subparts (1) through (5) above. Receiver is permitted to maintain sufficient cash on hand to enable Receiver to meet those expenses.

o. **Accounting**.  Beginning in December 2014, on or before the 15th day of each month, Receiver shall make an accounting of all revenues collected and all fees and expenses paid for the previous month and shall file said accounting with the Court and shall serve upon Tatonka's counsel and Defendants' counsel, a copy of said accounting, and also to all other parties who appear in this proceeding and who request notice.  Receiver shall file a final report within sixty (60) days after the termination of the receivership's operations;

p. **Payment of Expenses Incurred in Running the Business After the Receiver is Appointed**.  Receiver is permitted to pay all expenses incurred on or after the date Receiver is appointed in the normal and ordinary course of business of the Property.  To the extent the income from the Property is not sufficient to pay the expenses of operating the business, Receiver may seek a Receivership Loan as set forth above.  All fees and expenses of Receiver shall constitute a first lien and charge against the Property, with priority ahead of all other liens and security interests, including without limitation the liens and security interests of secured lenders and all other creditors.  The Receiver shall not be obligated to pay any expenses incurred with regard to the Property or the operations of the Companies prior to

Receiver taking possession of the Property, nor shall Receiver be required to use any revenues in payment of such expenses. **The Receiver shall pay salaries and wages of all employees incurred prior to the beginning of the Receivership in the ordinary course of Companies' business within the month immediately preceding the Receiver's appointment and the employment taxes due in connection with these payrolls.** Receiver may, in Receiver's sole and absolute discretion, pay other expenses that were incurred in the normal and ordinary course of business of the Property and that were incurred prior to Receiver taking possession of the Property if, and only if, the payment of any such pre-receivership expenses or ongoing payments in long term contracts is necessary and essential to the ongoing operation of the Companies (e.g., utilities, leases, executory contracts, and mortgages). It shall be incumbent upon Receiver, in Receiver's sole and absolute discretion, to make a determination as to which expenses, if any, incurred prior to the Receiver's taking possession of the Property were incurred in the normal and ordinary course of business and the payment of which is necessary and essential to the ongoing operation of the Companies. Receiver's determination of such is binding on the parties hereto. The Receiver may in its reasonable discretion pay past due and ongoing lease

and mortgage payments, and may also renegotiate same in its reasonable discretion;

q. **Right to File Bankruptcy Petition.**  Receiver and/or Defendants are empowered to file a bankruptcy petition under any Chapter of the United States Bankruptcy Code for each and all of the Companies.

r. **Compliance with Laws.**  Receiver shall take reasonable actions to ensure that it complies with all laws and regulations, particularly those applicable to education companies and schools.  All governmental agencies shall deal with the Receiver, or Receiver's designee, as the sole representative of the Companies;

s. **Receiver's Liability.**  Except in the event of gross negligence, willful misconduct, or actions in violation of orders of the Court, Receiver (and its representatives, employees, agents and professionals) shall have no personal liability for any obligations incurred in the course of the receivership, any and all such liabilities being limited to the assets (including the cash and cash equivalents) received and generated by Receiver in the course of the receivership, subject to the existing lien of secured creditors.  Receiver shall have no liability with respect to taxes incurred prior to the receivership.  Pre-receivership taxes may be paid from proceeds of the sale of the Companies'

assets in accordance with the priority owed to such taxes. Tatonka will hold

Receiver harmless except in connection with any willful misconduct or gross

negligence by Receiver; and

t. **Receiver's Authority**. The authority granted to Receiver is self-executing.

5.     Receiver's appointment is effective immediately upon entry of this

Order, and Receiver shall be authorized, subject to control of this Court, to do any

and all of the above acts necessary to the proper and lawful conduct of the

receivership, provided that within fourteen (14) days of the date hereof, Receiver

shall post a bond in the amount of $5,000,000.00 (Five million dollars) conditioned

upon its performance of its duties as set forth herein. The cost of this bond shall be

borne exclusively by Tatonka subject to further orders of this Court.

6.     To ensure the orderly operation of the receivership and maximize the

value of the assets, Receiver's proposed fee arrangment as set forth in the Motion

for Receiver is approved, and Receiver shall be compensated as follows:

a. Receiver shall be paid a fee based on the hourly rates of its internal

professionals, not exceeding $350 per hour.  Receiver and its

supporting staff shall be reimbursed for all reasonable out-of-pocket

expenses, including travel expenses, reasonably incurred in the

discharge of its rights and duties as Receiver, and any professional

fees and expenses incurred by outside professionals retained by Receiver in its sole discretion, all of which shall be deemed to be "expenses" of Receiver under this Court;

b. Receiver shall be entitled to retain such professionals on such terms and conditions as Receivers deems necessary in connection with the performance of Receiver's duties hereunder. Receiver and Receiver's retained professionals shall prepare periodic statements of services rendered and time expended during the course of the receivership. Those periodic statements shall be filed with the Court and made available to the parties in this litigation;

c. Unless a party files a written motion objecting to the payment of a periodic Receiver's invoice within fourteen (14) calendar days of filing of the invoice, Receiver is authorized to pay: (i) fifty percent (50%) of Receiver's fees, (ii) ninety percent (90%) of any retained professional's fees, and (iii) one-hundred percent (100%) of expenses in the invoice. In the event that a written objection to the payment of the invoice is timely made with Receiver and the Court, the objection should be set for hearing by the objecting party as soon as practicable;

d. If a timely objection is filed, then until an order is entered concerning the objection is entered, Receiver shall be authorized to pay only forty percent (40%) of the fees stated in the invoice at issue and shall hold back payment of the rest;

e. In the event of a sale of operating assets to a purchaser other than a secured creditor or its affiliate, Receiver shall be paid the remaining balance of its fees and any expenses plus a success fee of 2.0% of the gross proceeds subject to notice and a right to be heard by Defendants;

f. In the event of a sale of operating assets to a secured creditor or its affiliates, Receiver shall be paid the remaining balance of its fees and any expenses plus a success fee of 0.5% of the gross proceeds subject to notice and a right to be heard by Defendants; and

g. Upon the sale of operating assets or other resolution of the receivership, the remaining balance of the fees owed to Receiver and its professionals shall be paid prior to the final report or dismissal of the receivership.

7.     Receiver will, within sixty (60) days of qualification and appointment, file in this action a commercially reasonable inventory of all items of which Receiver has taken possession. If Receiver subsequently comes into possession of

substantial additional items, Receiver will file a supplemental inventory when practical.  Receiver will file monthly reports apprising the Court of the status of the Property and will serve the reports upon the parties in this litigation.

8.     Because of the large size of this multi-state receivership, the ten (10) day period for filing companion proceedings in other districts contained in 28 U.S.C. § 754 is extended to sixty (60) days.

9.     Receiver may, in its sole and absolute discretion, resign its office as Receiver by providing not less than thirty (30) days written notice to counsel for Tatonka and the Companies, and by filing such notice with this Court.

10.     The liability of Receiver and its professionals, agents, representatives, employees, affiliates, successors, and assigns, for any and all claims, liabilities, damages, fees, costs, expenses, and charges incurred or arising from their respective acts or omissions in connection with Defendants, this Order, the receivership established pursuant to this Order, and/or the Property, shall exist only to the extent that this Court determines by a final and non-appealable judgment that such acts or omissions resulted solely from such person's bad faith or gross negligence.  Any such liability shall be paid as an expense of the receivership when and as incurred.  This provision shall survive the termination or resignation of Receiver, and the termination or suspension of the receivership.

11.    In order to promote judicial economy, all persons, partnerships, firms, corporations, and entities are hereby enjoined from proceeding to place an involuntary lien upon or levy upon or from otherwise interfering with Receiver's exclusive possession of the Property or its carrying out of any duty under this Order including the cancellation of any executory contracts, licenses, or other rights held by any of the Companies during the pendency of this receivership, unless such person first obtains prior permission from this Court. Any interested party may appear and pursue in this court any claim it may have against any of the Companies, including seeking to remove its collateral or other assets from the Receiver's control, cancelling executory contracts, leases, insurance and the like. Such persons need not intervene as a party to have their rights fully heard and adjudicated.

12.    All third parties (including but not limited to financial institutions) in possession of any Property subject to this Order are hereby ordered to turn over such assets to Receiver within seven (7) business days of receipt of a copy of this Order.

IT IS SO ORDERED this 21st day of October, 2014.

Timothy C. Batten, Sr.
United States District Judge

21

**EXHIBIT "B"**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TATONKA CAPITAL CORPORATION, a Colorado corporation, | ) )  ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MOSAICA EDUCATION, INC., a Delaware corporation; MICHIGAN EDUCATIONAL FACILITIES, LLC, a Delaware limited liability company; ASI TEXAS, LLC, a Delaware limited liability company; EFA COMPANY, LLC, a Michigan limited liability company; LORAIN-LEAVITT PROPERTIES, LLC, a Georgia limited liability company; WARREN-ELM FACILITIES, LLC, a Georgia limited liability company; and COLUMBUS-MORSE PROPERTIES, LLC, a Georgia limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

CIVIL ACTION NO. 1:14-CV-03017-TCB

## ORDER APPOINTING RECEIVER

This matter came to be heard upon the *Motion for Appointment of Receiver* (the "Motion"), filed by plaintiff Tatonka Capital Corporation ("Tatonka" or "Plaintiff"). The Motion was filed contemporaneously with Tatonka's *Complaint for Breach of Contract and for Appointment of a Receiver* (the "Complaint"), commencing the instant action. The Complaint and Motion are filed against

defendants Mosaica Education, Inc. ("MEI") and certain of its wholly owned subsidiaries ("Subsidiaries"). Collectively, MEI and the Subsidiaries are referred to as the "Companies" or "Defendants".

The Court, after notice and an evidentiary hearing, having considered the pertinent pleadings, evidence, and argument of counsel, finds that the appointment of a receiver is appropriate and the Motion is due to be granted as set forth herein:

IT IS HEREBY **ORDERED, ADJUDGED,** and **DECREED** that the Motion is **GRANTED,** and that:

The Court finds that the appointment of a receiver for the assets and business operations of all of the Companies is proper and for good cause shown, both as a legal remedy based on contract and an equitable remedy based on the facts shown. The receiver's specific duties, rights, and obligations are set forth below. **The receiver's paramount duties are to provide appropriate and quality educational services at the schools operated by the Companies and to preserve, protect, and enhance the value of the Companies. Therefore, the receiver shall do its best to retain the vast majority of the present employees so as to maintain confidence and continuity. All other duties are subordinate to these primary duties.**

1.    To the extent the Receiver is obligated to deliver notices, reports, budgets, requests, and other information to Tatonka by the terms of this Order, the Receiver shall also contemporaneously deliver such papers to Defendants' counsel. Defendants' shareholders are granted standing on behalf of the Companies solely for the purpose of asserting and prosecuting defenses and claims against Tatonka. The deadline to respond to Tatonka's complaint shall be extended to February 26, 2015.

2.    GGG Partners, LLC, by and through its Managing Partner Katie S. Goodman, is hereby appointed receiver ("Receiver") of all of the Companies' assets and operations, including all real property, personal property, mixed property, and all stock and ownership interests held by MEI in its various subsidiaries, along with associated voting rights (the "Property"). Receiver is not an attorney for or related to any party to this action.

3.    The Property includes, without limitation, all of the Companies' assets, including management of charter schools, as well as all books and records related to the assets and business, accounts receivable reports, reports, revenues and proceeds of all assets, surety and performance bonds, letters of credit, security deposits, tax deposits, operations, performance deposits, escrow deposits, deposit accounts, keys, access codes and cards, books, records, accounts, bank accounts,

checkbooks, ledgers, accounts payable and accounts receivable records, leases,

reports, insurance policies and certificates, executory contracts, leasehold interests,

plans, specifications, drawings, surveys, technical manuals for all systems, together

with operating procedures, passwords, security codes, warranties, records required

to be kept under applicable safety, health care, and environmental laws, licenses,

permits, rights related to any state, federal, and local education agencies and

authorities, all tax benefits and rights, proffers, entitlements, trademarks, service

marks, trade names, intellectual property rights (including but not limited to the

Paragon© curriculum), claims, causes of action, choses in action and in general all

other information, data, instruments, documents, rights, properties or assets of any

kind or character whatsoever (whether tangible or intangible and whether real,

personal or mixed) forming a part of or related to the ownership, development, use,

operation and/or management of any and all of the Companies' assets, including

any and all assets that Receiver needs to perform Receiver's duties.

4.    Subject to control of this Court and the laws regarding receivership,

Receiver is authorized, pursuant to this Order, to do any and all acts necessary for

the proper and lawful conduct of the receivership.    Specifically, the following

orders are entered:

4

a. **Receiver's Exclusive and Complete Control over the Property.** Receiver is authorized to take and have complete and exclusive control and possession of the Property. Receiver is vested with all of the Property including the books, records, files, data, and information of the Companies;

b. **Bank Accounts.** Without any further action from the boards of the Companies, this Order authorizes Receiver to take control of existing bank accounts and to open any new bank accounts, and further authorizes Receiver to add and remove any existing signatories of any bank accounts. Receiver shall also be entitled to copies of any historical bank records of the Companies.

c. **Companies' Actions.** Until further order of the Court, any and all of the Companies and any persons acting under their direction or in concert with them are: (1) directed to deliver the Property to Receiver or as otherwise directed by Receiver; (2) enjoined from disturbing the Receiver's use and possession of the Property or other property that is the subject of this Order in any way; (3) prohibited and restrained from disposing of, dissipating, mishandling, or misappropriating any of the Property or other property that is the subject of this Order; (4) prohibited from taking any actions that would, directly or indirectly, have an adverse impact on the value of the

Property; (5) prohibited and restrained from canceling, reducing or modifying any and all insurance coverage in existence with respect to the Property; and (6) prohibited and restrained from collecting any sums due to the Companies;

d. **Receiver's Right to Prevent Waste of, and to Preserve and/or Enhance the Property**. Effective immediately, Receiver is directed to take any and all actions Receiver deems commercially reasonable and appropriate to keep operating the schools, provide services to the schools, to prevent waste to the Property, to preserve, secure, manage, maintain, safeguard, and enhance the Property and all other forms of property to which Receiver is entitled to take possession and control under this Order, and may, where appropriate in the exercise of its business judgment, take actions to enhance education services, and the value of the Property. Receiver shall take reasonable actions to ensure that it complies with all laws applicable to the possession, use, occupancy, management, operation, and maintenance of the Property as provided under any and all laws and regulations;

e. **Budget**. Beginning in December 2014, on or before the fifteenth (15th) business day in the month, and on or before the same day of every month thereafter until the receivership created by this Order is terminated, Receiver

shall furnish to Defendants and Tatonka a detailed, projected, monthly operating budget for the fiscal year for Receiver and the Property (as may be amended from time to time, the "Budget").  Tatonka and Defendants shall advise Receiver in writing within ten (10) business days after receipt of the Budget, or any amendment thereof, whether Tatonka or Defendants disapproves of the Budget, or any amendment thereof.   If Receiver, Defendants, and Tatonka are unable to resolve any dispute concerning the Budget, any party may petition the Court for a hearing to resolve such dispute;

f. **Receiver's Right to Manage, Maintain, and Operate the Property**. Receiver is authorized to manage and operate the Companies, including appointing the Receiver as the sole director, officer, member, board member, and manager, as applicable, of each of the Companies and all of their wholly owned direct or indirect subsidiaries.  Receiver is further authorized accept new students into the various operated schools, and to employ and pay such teachers, education professionals and workers, contractors, brokers, accountants, attorneys, and other persons and professionals as Receiver may in its sound business judgment deem necessary or appropriate in the management, conduct, control, or custody of the affairs of Companies and

the Property.   Receiver is further authorized to make payments and disbursements in the ordinary course of business and to make such payments and disbursements as may be necessary and proper for the preservation, maintenance, security, and enhancement of the Property.   Receiver may, but shall not be required to, perform under any contract or lease entered into prior to the date on which it assumes possession of the Property. Prior to taking any action previously authorized in this subparagraph, Receiver shall obtain any such approvals and/or consents that Companies would be required to obtain under applicable laws and regulations prior to taking any such action;

g. **Receiver Authorized to Market and Sell the Property**.   Receiver is authorized to market and sell unneeded pieces of the Property (as determined by the Receiver in its sole discretion) where the value of the individual asset is less than $25,000.   The sale of any material assets needed for operations may be approved only on the prior permission of the Court, after notice and right to be heard to the applicable school authority, Defendants and to Tatonka, and any other creditor or party in interest requesting notice in writing and served on the Receiver. The Court will look with disfavor on any proposed sale of any operating school that would result in the closing of

8

the school, particularly during the school year. Nonetheless, if such operation is creating financial instability, then the Court might permit such closure. Subject to such notice and approval, Receiver is authorized to sell all or a portion of the Property and other collateral, and execute on Defendants' behalf any necessary documents in connection with such sale and/or assumption. All liens, claims, interests, and encumbrances on any Property sold shall attach to any and all proceeds of such sale in the priority they now attach to the Property;

h. **Receiver's Right to Collect Amounts Due**. Receiver is authorized to receive and collect any and all sums due or owing to Companies in any manner related to the Property, whether the same are now due or shall hereafter become due and owing, to deposit such sums into an account established and maintained by Receiver, and to expend such sums on the operation and management of the Property in the ordinary course of its business. All persons in possession of the Property or any portion thereof are hereby directed to attorn to Receiver, and until further order of this Court are hereby: (i) directed to pay over to Receiver or its duly designated agent all rents, revenues, proceeds, or other sums payable with respect to the Property which are now due and unpaid or hereafter become due, and (ii)

enjoined and restrained from paying to Companies or their agents, officers, directors, employees, or attorneys any such rents, revenues, proceeds, or other sums;

i. **Disputes and Legal Actions Related to the Property and the Companies**. Subject to the provisions of Paragraph 1, Receiver is authorized to litigate, investigate, negotiate, and compromise for the Companies any and all disputes related to the Property or to the Companies. The Receiver can do so in its own name or in the name of the Companies. However, the Companies' shareholders may on their own contest any and all aspects of this proceeding in this Court;

j. **Insurance**. Receiver is authorized to maintain appropriate property insurance for the Property and Companies, public liability insurance, worker's compensation insurance, fire and extended coverage insurance, malpractice, health care, burglary and theft insurance, and other types of insurance normally obtained in connection with the operation and management of the Property and Companies, and is authorized to continue any current policies in place and to purchase further insurance as Receiver deems appropriate;

k. **Payment of Taxes; Preparation and Filing of Tax Returns for the Property**. Receiver is authorized to (i) pay all current and past due taxes, and any other taxes and any other governmental assessments against the Property, and (ii) prepare and file tax returns with respect to the Property, and other property subject hereto, as may be required by law. Receiver is authorized to negotiate with the Internal Revenue Service and other taxing authorities concerning any past due taxes that the Companies may owe and, in connection therewith, Receiver may execute a power of attorney on behalf of the Companies authorizing Receiver to conduct such negotiations. However, other than as set forth in a budget, any payment of past due employment taxes may not be made without express Court approval.

l. **Receiver's Right to Borrow Money.** In the event Receiver determines in its sole business judgment that Companies need more cash in order to adequately maintain the operations of the Property, Receiver is hereby authorized to borrow such funds and expenses as may be necessary to pay such costs and expenses on ordinary business terms as Receiver may negotiate and agree. However, such loan can prime the lien position of any Tatonka only upon either its consent or upon Court approval after due notice, a hearing, and a Court determination that such loan is in the best

interest of the receivership estate with due regard for the rights of all, particularly any secured creditor being primed (the "Receivership Loan"). The Receivership Loan shall bear interest at a reasonable rate, with such lien primed only by the unpaid fees and expenses of Receiver, subject to the rights of secured creditors as provided above.   However, no personal recourse shall be had against Receiver with respect to the Receivership Loan, and any lender to the Receiver shall look solely to the Property and Companies' assets to satisfy any Receivership Loan;

m. **Payment of Utilities; Maintenance of the Property.** Receiver is authorized to: (1) negotiate and enter into new agreements, and contracts in the ordinary course of the business of the Property; (2) modify existing agreements and contracts in the ordinary course of the business of the Property; (3) pay all utilities, expenses, and other obligations secured by the Property or which may give rise to liens on the Property, and all other outstanding obligations to suppliers and service providers to the Companies for goods and services provided in the ordinary course of business as set forth in subsection (p) herein; and (4) make repairs necessary to the maintenance of the Property in the ordinary course of business in order to preserve the Property;

n. **Application of Income from the Property**. Receiver shall apply income from the Property as set forth elsewhere herein and, subject to the lien rights of secured creditors, as follows to the extent cash is available: (1) Receiver's approved fees and expenses; (2) the current operating expenses of the receivership in the ordinary course of the business and receiver's professionals; (3) payment of budgeted amounts for past due federal employment taxes as agreed upon in a tax payment plan by and between the Receiver, solely in its capacity as Receiver for the Property, on the one hand, and the Internal Revenue Service, on the other hand (the "Tax Plan"); (4) to a reserve account of $500,000 to cover upcoming expenses; (5) to the extent funds remain after payment of the foregoing items, a weekly amount, as stipulated in the budget may be paid to Tatonka, plus Tatonka's reasonable attorneys' fees (subject to the provisions of paragraph 6(d) below). Unless and until a Tax Plan is effectuated, the Receiver shall not make any payments on account of subparts (4) or (5) above. If and when the Tax Plan is effectuated, the Receiver shall apply income from the Property as set forth in subparts (1) through (5) above. Receiver is permitted to maintain sufficient cash on hand to enable Receiver to meet those expenses.

o. **Accounting**. Beginning in December 2014, on or before the 15th day of each month, Receiver shall make an accounting of all revenues collected and all fees and expenses paid for the previous month and shall file said accounting with the Court and shall serve upon Tatonka's counsel and Defendants' counsel, a copy of said accounting, and also to all other parties who appear in this proceeding and who request notice. Receiver shall file a final report within sixty (60) days after the termination of the receivership's operations;

p. **Payment of Expenses Incurred in Running the Business After the Receiver is Appointed**. Receiver is permitted to pay all expenses incurred on or after the date Receiver is appointed in the normal and ordinary course of business of the Property. To the extent the income from the Property is not sufficient to pay the expenses of operating the business, Receiver may seek a Receivership Loan as set forth above. All fees and expenses of Receiver shall constitute a first lien and charge against the Property, with priority ahead of all other liens and security interests, including without limitation the liens and security interests of secured lenders and all other creditors. The Receiver shall not be obligated to pay any expenses incurred with regard to the Property or the operations of the Companies prior to

Receiver taking possession of the Property, nor shall Receiver be required to use any revenues in payment of such expenses. **The Receiver shall pay salaries and wages of all employees incurred prior to the beginning of the Receivership in the ordinary course of Companies' business within the month immediately preceding the Receiver's appointment and the employment taxes due in connection with these payrolls.** Receiver may, in Receiver's sole and absolute discretion, pay other expenses that were incurred in the normal and ordinary course of business of the Property and that were incurred prior to Receiver taking possession of the Property if, and only if, the payment of any such pre-receivership expenses or ongoing payments in long term contracts is necessary and essential to the ongoing operation of the Companies (e.g., utilities, leases, executory contracts, and mortgages). It shall be incumbent upon Receiver, in Receiver's sole and absolute discretion, to make a determination as to which expenses, if any, incurred prior to the Receiver's taking possession of the Property were incurred in the normal and ordinary course of business and the payment of which is necessary and essential to the ongoing operation of the Companies. Receiver's determination of such is binding on the parties hereto. The Receiver may in its reasonable discretion pay past due and ongoing lease

and mortgage payments, and may also renegotiate same in its reasonable discretion;

q. **Right to File Bankruptcy Petition.** Receiver and/or Defendants are empowered to file a bankruptcy petition under any Chapter of the United States Bankruptcy Code for each and all of the Companies.

r. **Compliance with Laws.** Receiver shall take reasonable actions to ensure that it complies with all laws and regulations, particularly those applicable to education companies and schools. All governmental agencies shall deal with the Receiver, or Receiver's designee, as the sole representative of the Companies;

s. **Receiver's Liability.** Except in the event of gross negligence, willful misconduct, or actions in violation of orders of the Court, Receiver (and its representatives, employees, agents and professionals) shall have no personal liability for any obligations incurred in the course of the receivership, any and all such liabilities being limited to the assets (including the cash and cash equivalents) received and generated by Receiver in the course of the receivership, subject to the existing lien of secured creditors. Receiver shall have no liability with respect to taxes incurred prior to the receivership. Pre-receivership taxes may be paid from proceeds of the sale of the Companies'

assets in accordance with the priority owed to such taxes. Tatonka will hold

Receiver harmless except in connection with any willful misconduct or gross

negligence by Receiver; and

t. **Receiver's Authority**. The authority granted to Receiver is self-executing.

5.      Receiver's appointment is effective immediately upon entry of this

Order, and Receiver shall be authorized, subject to control of this Court, to do any

and all of the above acts necessary to the proper and lawful conduct of the

receivership, provided that within fourteen (14) days of the date hereof, Receiver

shall post a bond in the amount of $5,000,000.00 (Five million dollars) conditioned

upon its performance of its duties as set forth herein. The cost of this bond shall be

borne exclusively by Tatonka subject to further orders of this Court.

6.      To ensure the orderly operation of the receivership and maximize the

value of the assets, Receiver's proposed fee arrangment as set forth in the Motion

for Receiver is approved, and Receiver shall be compensated as follows:

a. Receiver shall be paid a fee based on the hourly rates of its internal

professionals, not exceeding $350 per hour. Receiver and its

supporting staff shall be reimbursed for all reasonable out-of-pocket

expenses, including travel expenses, reasonably incurred in the

discharge of its rights and duties as Receiver, and any professional

fees and expenses incurred by outside professionals retained by Receiver in its sole discretion, all of which shall be deemed to be "expenses" of Receiver under this Court;

b. Receiver shall be entitled to retain such professionals on such terms and conditions as Receivers deems necessary in connection with the performance of Receiver's duties hereunder. Receiver and Receiver's retained professionals shall prepare periodic statements of services rendered and time expended during the course of the receivership. Those periodic statements shall be filed with the Court and made available to the parties in this litigation;

c. Unless a party files a written motion objecting to the payment of a periodic Receiver's invoice within fourteen (14) calendar days of filing of the invoice, Receiver is authorized to pay: (i) fifty percent (50%) of Receiver's fees, (ii) ninety percent (90%) of any retained professional's fees, and (iii) one-hundred percent (100%) of expenses in the invoice. In the event that a written objection to the payment of the invoice is timely made with Receiver and the Court, the objection should be set for hearing by the objecting party as soon as practicable;

d. If a timely objection is filed, then until an order is entered concerning the objection is entered, Receiver shall be authorized to pay only forty percent (40%) of the fees stated in the invoice at issue and shall hold back payment of the rest;

e. In the event of a sale of operating assets to a purchaser other than a secured creditor or its affiliate, Receiver shall be paid the remaining balance of its fees and any expenses plus a success fee of 2.0% of the gross proceeds subject to notice and a right to be heard by Defendants;

f. In the event of a sale of operating assets to a secured creditor or its affiliates, Receiver shall be paid the remaining balance of its fees and any expenses plus a success fee of 0.5% of the gross proceeds subject to notice and a right to be heard by Defendants; and

g. Upon the sale of operating assets or other resolution of the receivership, the remaining balance of the fees owed to Receiver and its professionals shall be paid prior to the final report or dismissal of the receivership.

7.     Receiver will, within sixty (60) days of qualification and appointment, file in this action a commercially reasonable inventory of all items of which Receiver has taken possession. If Receiver subsequently comes into possession of

substantial additional items, Receiver will file a supplemental inventory when practical.  Receiver will file monthly reports apprising the Court of the status of the Property and will serve the reports upon the parties in this litigation.

8.     Because of the large size of this multi-state receivership, the ten (10) day period for filing companion proceedings in other districts contained in 28 U.S.C. § 754 is extended to sixty (60) days.

9.     Receiver may, in its sole and absolute discretion, resign its office as Receiver by providing not less than thirty (30) days written notice to counsel for Tatonka and the Companies, and by filing such notice with this Court.

10.     The liability of Receiver and its professionals, agents, representatives, employees, affiliates, successors, and assigns, for any and all claims, liabilities, damages, fees, costs, expenses, and charges incurred or arising from their respective acts or omissions in connection with Defendants, this Order, the receivership established pursuant to this Order, and/or the Property, shall exist only to the extent that this Court determines by a final and non-appealable judgment that such acts or omissions resulted solely from such person's bad faith or gross negligence.  Any such liability shall be paid as an expense of the receivership when and as incurred.  This provision shall survive the termination or resignation of Receiver, and the termination or suspension of the receivership.

11.    In order to promote judicial economy, all persons, partnerships, firms, corporations, and entities are hereby enjoined from proceeding to place an involuntary lien upon or levy upon or from otherwise interfering with Receiver's exclusive possession of the Property or its carrying out of any duty under this Order including the cancellation of any executory contracts, licenses, or other rights held by any of the Companies during the pendency of this receivership, unless such person first obtains prior permission from this Court.  Any interested party may appear and pursue in this court any claim it may have against any of the Companies, including seeking to remove its collateral or other assets from the Receiver's control, cancelling executory contracts, leases, insurance and the like. Such persons need not intervene as a party to have their rights fully heard and adjudicated.

12.    All third parties (including but not limited to financial institutions) in possession of any Property subject to this Order are hereby ordered to turn over such assets to Receiver within seven (7) business days of receipt of a copy of this Order.

IT IS SO ORDERED this 21st day of October, 2014.

Timothy C. Batten, Sr.
United States District Judge

21